**Lawrence M. FLEMING, Plaintiff–Appellee,**

v.

**DEPARTMENT OF PUBLIC SAFETY, COMMONWEALTH of the NORTHERN MARIANA ISLANDS, Defendant–Appellant.**

No. 85–2694.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 6, 1986.

Decided Jan. 21, 1988.

As Amended April 8, 1988.

Douglas F. Cushnie, Saipan, Com. of the Northern Mariana Islands, for plaintiff-appellee.

Patricia Gunzelman Beatley, Saipan, Com. of the Northern Mariana Islands, for defendant-appellant.

Charles Scott, Saipan, Com. of the Northern Mariana Islands, for amicus curiae Trust Territory of the Pacific Islands.

Before NELSON, REINHARDT and WIGGINS, Circuit Judges.

REINHARDT, Circuit Judge:

The Department of Public Safety of the Commonwealth of the Northern Mariana Islands ("Commonwealth" or "Northern Marianas") appeals a jury verdict awarding $80,000 to Lawrence Fleming in a civil rights action under 42 U.S.C. § 1983 (1982). We agree with the district court that the Commonwealth does not enjoy eleventh amendment immunity from suits and can therefore be sued under section 1983. However, because we find that Fleming has suffered no cognizable injury, we conclude that appellant's motion for judgment notwithstanding the verdict ("j.n.o.v.") should have been granted.

## I. Background

In January 1984, Fleming along with several others applied for the job of Police Officer I with the Department of Public Safety. Because there were approximately 16 vacancies at that time, and at least that many applicants, the Department set up four person Police Boards to interview applicants. These Boards recommended qualified candidates to the Director of the Department, who further reviewed applications. The Personnel Office conducted whatever further review that was warranted.

On January 18, 1984, Fleming interviewed with the Department for employment as a police officer. While his application was being considered, the Police Board received information connecting Fleming to drug dealing. On January 25, a member of the Board telephoned the Drug Enforcement Agency in Guam to determine the accuracy of the allegations. He was advised that the allegations were false and the Board recommended Fleming along with several others to the Director of Public Safety.

On January 26, 1984, a memorandum was issued listing the individuals who were to be hired by the Department. Fleming was not included. The Director had delayed recommending Fleming to the Director of Personnel pending his own further consideration of the matter. One week later, on February 3, 1984, the Director sent Fleming's application to the Personnel Office for approval. On February 7, 1984, the Personnel Office contacted Fleming to offer him a position with the Department. Fleming responded that he did not want the job because his career on the police force would be tarnished by the drug allegations. Also, police academy training had already begun by this time, and, according to Fleming, he did not want to start the academy late.

Later in 1984, Fleming brought suit against the Department in the District Court for the Northern Mariana Islands. He alleged that the Department's handling of his application deprived him of his constitutional rights to due process and equal protection in violation of section 1983. After a trial on the merits, a jury agreed, and awarded him $80,000 in damages.

The Department then moved for a j.n.o.v. on the ground that the sovereign immunity afforded the states under the eleventh amendment and under common law is applicable to the Commonwealth, thereby making the Commonwealth immune from suit under section 1983. The Department also claimed that appellee did not suffer constitutional harm violative of section 1983. The district court denied the motion. The Department timely appeals under 48 U.S.C. § 1694(c) (1982).

## II. The Commonwealth's Relationship with the United States

At the time of the filing of Fleming's suit, two documents defined the Commonwealth's relationship with the United States. The first, the Trusteeship Agreement for the Former Japanese Mandated Islands, *entered into force* July 18, 1947, 61 Stat. 3301, T.I.A.S. No. 1665, 8 U.N.T.S. 189 ("Trusteeship Agreement"), established the United States as the United Nations trustee of the Trust Territory of the Pacific Islands. (The Northern Mariana Islands were part of the Trust Territory.) The Trusteeship Agreement granted the United States "full powers of administration, legislation, and jurisdiction over the territory subject to the provisions of this agreement," and allowed it to "apply to the trust territory . . . such of the laws of the United States as it may deem appropriate to local conditions and requirements." Trusteeship Agreement art. 3. The Trusteeship Agreement also obligated the United States to "promote the development of the inhabitants of the trust territory toward self-government or independence," *id.* art. 6, § 1, and to "protect the rights and fundamental freedoms of all elements of the population without discrimination," *id.* art. 6, § 3. *See generally Gale v. Andrus,* 643 F.2d 826, 828–30 (D.C.Cir.1980) (further describing the Trusteeship Agreement).

The people of the Northern Mariana Islands in recent years have elected to enter into a closer relationship with the United States. On February 15, 1975, the United

States and the Marianas Political Status Commission for the people of the Northern Mariana Islands signed the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, *reprinted as amended in* 48 U.S.C.A. § 1681 (West 1987) ("Covenant"), and Congress thereafter approved the Covenant. Act of Mar. 24, 1976, Pub.L. No. 94–241, 90 Stat. 263. The Covenant establishes the Commonwealth and defines its political relationship with the United States. *See generally Commonwealth of the Northern Mariana Islands v. Atalig,* 723 F.2d 682, 685 (9th Cir.) (describing terms of Covenant), *cert. denied,* 467 U.S. 1244, 104 S.Ct. 3518, 82 L.Ed.2d 826 (1984). In 1984, most of the provisions of the Covenant were in effect. *Id.; see* Covenant § 1003. It is the terms of that document that are dispositive here.

■ Trust Territories are *sui generis.* Each one must be viewed independently to determine the rights granted to its citizenry, the rights reserved to itself, and those possessed by the federal government. *See, e.g., Com. of Northern Marianas v. Atalig,* 723 F.2d 682, 684–85 (9th Cir.1984). Ac-

cordingly, we must examine the Covenant carefully to determine the precise nature of the Commonwealth's governance.[1]

## III. Applicability of Section 1983 to the Commonwealth

■ Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (1982). In its appellate briefs, the Department did not dispute that section 1983 applies in the Commonwealth.[2] We agree. Section 502(a)(2) of the Covenant expressly makes those laws applicable to Guam and "of general application to the several States" applicable to the Commonwealth.[3] Be-

---

**1.** During this appeal, on November 3, 1986, the President of the United States proclaimed the Trusteeship Agreement terminated with respect to the Commonwealth. Proclamation No. 5564, 51 Fed.Reg. 40,399 (1986); *see* Covenant § 1002 (President will issue proclamation terminating the Trusteeship Agreement). The Covenant states that its provisions not effective upon its approval or upon Presidential proclamation become effective upon termination of the Trusteeship Agreement. Covenant § 1003(c). Any change in the Commonwealth's status resulting from the President's November 3, 1986, proclamation does not affect the following analysis of the Covenant, because the relevant provisions of the Covenant—sections 501 and 502—were already in effect at the time of the filing of this suit. *See* Proclamation No. 4534, § 2, 42 Fed. Reg. 56,593, 56,594 (1977) (Covenant §§ 501, 502 effective on January 9, 1978).

**2.** The Department raised this issue for the first time in its petition for rehearing and rehearing en banc. Courts of appeals ordinarily will not consider for the first time on rehearing issues not presented by the parties in their appellate briefs. *Escobar Ruiz v. I.N.S.,* 813 F.2d 283, 286 (9th Cir.1987), *aff'd,* No. 83–7502 (9th Cir. Feb. 1988) (en banc) (citing *Partenweederei, MS Belgrano v. Weigel,* 313 F.2d 423, 425 (9th Cir.1962)). A case must involve "'extraordinary circumstances'" to justify our consideration of issues

first raised on petition for rehearing. *Id.* at 286 (quoting *United States v. Sutherland,* 428 F.2d 1152, 1158 (5th Cir.1970) and citing *Moore v. United States,* 598 F.2d 439, 441–42 (5th Cir.1979)). While the issue here likely does not meet this threshold, we observe that the Department's arguments are not persuasive. The Department states that section 1983 does not apply in the Commonwealth because section 1983 does not apply in Guam, and cites a district court decision from the Territory of Guam that holds that Guam is not a "person" under section 1983. *Ignacio v. Salas,* No. 79–0118 (D. Guam 1982). However, in *Bunyan v. Camacho,* 770 F.2d 773 (9th Cir.1985), *cert. denied,* 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986), we said that section 1983 is applicable in Guam and reversed a summary judgment motion denying relief. *Bunyan* is controlling here, and in our view reaches the proper result.

**3.** Section 502(a) provides, in relevant part:

The following laws of the United States in existence on the effective date of this Section [January 9, 1978] and subsequent amendments to such laws will apply to the Northern Mariana Islands, except as otherwise provided in this Covenant:

. . .

(2) those laws ... which are applicable to Guam and which are of general application to

cause section 1983 is applicable by its terms and because it is applicable to Guam, *see, e.g., Bunyan v. Camacho,* 770 F.2d 773 (9th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986), and also to the states, we find that section 1983 applies to the Commonwealth. *See also* Proclamation No. 5207, § 5(m), 49 Fed. Reg. 24,365, 24,368 (1984) (U.S. citizenship not required for citizens of the Northern Mariana Islands to bring suit under section 1983).

### IV. Application of the Eleventh Amendment to the Commonwealth [4]

Suits against states under section 1983 are severely limited by the eleventh amendment. When, under section 1983, a citizen sues a state in its own name in federal court, the suit cannot proceed unless the state has waived its sovereign immunity and thereby consented to the suit. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 98–99, 104 S.Ct. 900, 906–907, 79 L.Ed.2d 67 (1984); *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 3057, 57 L.Ed.2d 1114 (1978) (per curiam). Thus, we must consider whether the Commonwealth, like the states, enjoys sovereign immunity under the eleventh amendment. A close examination of the Covenant convinces us that its drafters intended that the Commonwealth not enjoy such immunity.

■ Section 501(a) of the Covenant expressly enumerates those provisions of the United States Constitution that "will be applicable within the Northern Mariana Islands as if the Northern Mariana Islands were one of the several States." The eleventh amendment is conspicuously absent. Section 501(a) provides in full:

To the extent that they are not applicable of their own force, the following provisions of the Constitution of the United States will be applicable within the Northern Mariana Islands as if the Northern Mariana Islands were one of the several States: Article I, Section 9, Clauses 2, 3, and 8; Article I, Section 10, Clauses 1 and 3; Article IV, Section 1 and Section 2, Clauses 1 and 2; Amendments 1 through 9, inclusive; Amendment 13; Amendment 14, Section 1; Amendment 15; Amendment 19; and Amendment 26; provided, however, that neither trial by jury nor indictment by grand jury shall be required in any civil action or criminal prosecution based on local law, except where required by local law. Other provisions of or amendments to the Constitution of the United States, which do not apply of their own force within the Northern Mariana Islands, will be applicable within the Northern Mariana Islands only with approval of the Government of the Northern Mariana Islands and of the Government of the United States.

From the specificity with which the applicable provisions of the United States Constitution are identified, it is clear that the drafters considered fully each constitutional amendment and article for inclusion in the Covenant. That they deliberately declined to include the eleventh amendment unequivocally demonstrates their desire that the Commonwealth not be afforded eleventh amendment immunity. As the Supreme Court long ago observed, "in an instrument well drawn, as in a poem well composed, silence is sometimes most expressive." *Chisholm v. Georgia,* 2 U.S. (2 Dall.) 419, 454, 1 L.Ed. 440 (1793) (opinion of Wilson, J.). Furthermore, neither the government of the United States nor of the Commonwealth has since approved any law, compact, or treaty that would have the effect of making the eleventh amendment applicable to the Commonwealth.

Under these circumstances, the most basic rule of statutory construction is that the plain language of the statute should be

the several States as they are applicable to the several States....

4. We address this issue first because it is jurisdictional. *See Mansfield C. & L.M. Railway Co. v.*

*Swan,* 111 U.S. 379, 382, 4 S.Ct. 510, 28 L.Ed. 462 (1884), and *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

regarded as conclusive. *United States v. Mehrmanesh*, 689 F.2d 822, 828 (9th Cir. 1982) (citing *Bread Political Action Committee v. FEC*, 455 U.S. 577, 580–81, 102 S.Ct. 1235, 1237–38, 71 L.Ed.2d 432 (1982)). Where the language of the Covenant is as clear as it is here, and the legislative history and purpose are not to the contrary, we may not impose eleventh amendment immunity on the Commonwealth. *See INS v. Cardoza Fonseca*, —— U.S. ——, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987).

In reaching this conclusion, we have not ignored the language of section 502(a)(2). As discussed *supra*, section 502(a)(2) makes all laws, including section 1983, applicable to the Commonwealth "as they are applicable to the several States." The eleventh amendment is a fundamental limitation on the applicability of section 1983 to the states. Therefore, the argument goes, section 1983 as applied in the Northern Marianas is also subject to the eleventh amendment. A principal difficulty with this argument is that it leads to the inevitable conclusion that section 502(a)(2) incorporates the eleventh amendment *in toto*, since all federal laws are subject to the eleventh amendment. We believe that had the drafters intended to make the eleventh amendment applicable in the Commonwealth, they would have done so directly in section 501(a), the section that enumerates all of the constitutional provisions applicable to the Commonwealth, rather than incorporating it *sub rosa* through section 502(a)(2). A plain reading of the Covenant indicates a separation between constitutional and nonconstitutional provisions. We simply cannot subvert the well defined parameters of sections 501(a) and 502(a)(2) absent clear legislative intent. Were we to incorporate the eleventh amendment through section 502(a)(2), we would reduce that amendment to a mere "law" "generally applicable to the states," as opposed to a constitutional provision. The eleventh amendment cannot fairly be characterized as such.[5]

▆▆ We next consider whether the Commonwealth constitutes a "person" under section 1983. We address this issue because the Supreme Court has not expressly decided whether a state constitutes a person under the Act. *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), limits the applicability of section 1983 to states solely upon the force of the eleventh amendment. The Court said that Congress would have had to have been far more explicit about overriding such immunity in order to subject states to suits under section 1983 without their consent. *Id.* at 343–45, 99 S.Ct. at 1146–47. Indeed, the Court in *Quern* distinguished *Monell* strictly on eleventh amendment grounds, noting that *Monell* is "'limited to local government units which are not considered part of the State for Eleventh Amendment purposes.'" *Id.* at 338, 99 S.Ct. at 1144 (quoting *Monell*, 436 U.S. at 690 n. 54, 98 S.Ct. at 2035 n. 54). The law treats local governments differently from states under section 1983 not because local governments are somehow more like persons, but simply because local governments, unlike states, are not covered by the eleventh amendment. We conclude that governmental entities are persons for purposes of section 1983, but that those entities protected by the eleventh amendment remain immune from suits brought in federal court without their consent. Accordingly, while the Commonwealth enjoys many attributes of statehood, it may nevertheless be sued under section 1983; the Commonwealth is a person for purposes of that statute and, as we have concluded *supra*, it like local governments does not enjoy eleventh amendment immunity.[6]

---

5. The Department also argues that the eleventh amendment is incorporated through section 501(a), which provides that certain constitutional provisions are "applicable of their own force." Absent any evidence that even suggests that the eleventh amendment constitutes such a provision, we cannot conclude that the drafters of the Covenant intended to incorporate the eleventh amendment *sub silentio* through this clause.

6. We do not in any way mean to suggest that the attributes of sovereignty enjoyed by the Commonwealth are similar to those of local governments. Clearly, the Commonwealth possesses

We note that were states not persons under the Act, the issue of eleventh amendment immunity would not arise as it does in section 1983 cases involving states; the section would simply be inapplicable to the states by its terms. However, the issue in section 1983 suits against states is whether the state has waived its eleventh amendment immunity. *See Pennhurst,* 465 U.S. at 99, 104 S.Ct. at 907; *Pugh,* 438 U.S. at 782, 98 S.Ct. 3057; *Spaulding v. University of Washington,* 740 F.2d 686, 694 (9th Cir.), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984). If a state may waive its immunity from suits brought under section 1983 and be liable for monetary damages, a state, and *a fortiori* a Trust Territory like the Commonwealth, must be subject to the statute and thus a person under section 1983.[7]

## V. Common Law Sovereign Immunity and Section 1983

■ The Department also claims that the Commonwealth enjoys common law sovereign immunity, and that Fleming's suit is barred even if the eleventh amendment is not applicable. The Department cites *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), for the proposition that common law sovereign immunity constitutes an independent limitation on courts' Article III jurisdiction to hear cases against states. We do not reach this question, because we conclude that in entering into the Covenant the Commonwealth impliedly waived whatever immunity it might otherwise have enjoyed against suits in federal court arising under federal law.

A waiver of a sovereign's immunity can be found by express language, or by clear implication from the text. *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974) (citing *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909)). To determine whether the Commonwealth has waived its sovereign immunity from suits arising under federal law in the federal courts, we must look to the Covenant and its supporting documents.

The most telling evidence of a waiver is found in section 501(a) of the Covenant. As we have discussed above, the drafters of the Covenant made a deliberate decision not to adopt the eleventh amendment when they omitted that amendment from section 501(a). By so doing, they affirmatively elected to subject the Commonwealth to federal suits in federal court. The omission of the eleventh amendment thus clearly signals a waiver of any common law sovereign immunity against federal suits; there is simply no meaningful distinction between eleventh amendment immunity and common law sovereign immunity insofar as federal suits are concerned. *See Demery v. Kupperman,* 735 F.2d 1139, 1145 (9th Cir.1984) (citing *Pennhurst*), *cert. denied,* 469 U.S. 1127, 105 S.Ct. 810, 83 L.Ed.2d 803 (1985). Thus, when the drafters of the Covenant rejected the protections of the eleventh amendment, they must have also intended to forego any sovereign immunity from suit in federal court that the Commonwealth might otherwise enjoy. Otherwise, their decision to exclude the eleventh amendment would make little sense and have been of no practical effect.

far more of the attributes of statehood than of a local government entity. However, because the Commonwealth, like a local government, does not enjoy eleventh amendment immunity, it is more like a local government insofar as sovereign immunity is concerned.

7. Even were we to accept the contrary argument that a state is not a person for purposes of section 1983, we would still conclude that the Commonwealth is. This is because the argument that a state is not a person is premised exclusively upon the fact that states enjoy eleventh amendment immunity. *See Quern,* 440

U.S. at 343, 99 S.Ct. at 1146. The contention is that Congress did not intend to include within the term "person" those governmental entities protected by the eleventh amendment. However, as we have discussed *supra,* the Commonwealth, like local government entities, does not have eleventh amendment immunity. Therefore it, like local governments, was intended to be included within the statute and is a person for purposes of section 1983. Thus, irrespective of whether a state constitutes a person under section 1983, the Commonwealth does, and so may be sued under that statute.

A second basis upon which we find an implied waiver of immunity is contained in section 502(a)(2) of the Covenant, the section that makes section 1983 applicable to the Commonwealth. As we discussed above, were the eleventh amendment applicable to the Commonwealth, Commonwealth citizens would, contrary to the provision of section 502(a)(2), not be afforded the protections that section 1983 affords to citizens of the various states. We need not repeat that discussion here.

Third, we find confirmation of the implied waiver in the Marianas Political Status Commission's authoritative study of the Covenant. Regarding section 103 guaranteeing the Commonwealth's right of self-government, the Marianas Political Status Commission found that "the Government of the Northern Mariana Islands will have sovereign immunity, so that it cannot be sued *on the basis of its own laws* without its consent." *Section by Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands* 11 (1975) (emphasis supplied). The Commission's express statement regarding immunity from suit under Commonwealth laws and its omission of any reference to immunity from suit under federal laws constitutes persuasive evidence that, under the Covenant, the Commonwealth does not retain sovereign immunity from federal suits.

Thus, because the Commonwealth is a person under section 1983, because it lacks eleventh amendment immunity and because in the Covenant it waived any common law sovereign immunity from federal suit it might otherwise have possessed, Fleming may bring a section 1983 suit against the Department.

## VI. Section 1983 Claim

This appeal is from a motion for j.n.o.v. J.n.o.v. is proper if the evidence construed in the light most favorable to the non-moving party permits only one reasonable conclusion as to the verdict and that conclusion is contrary to the jury's; it is improper if reasonable minds could differ over the verdict. *Peterson v. Kennedy*, 771 F.2d 1244, 1252 (9th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986). Even construing the facts in such a light, and there are many in this record that are conflicting, we conclude that the verdict in Fleming's favor cannot stand.

■■■ Unlike most section 1983 claimants, Fleming was offered a job with the Department. His complaint is that he was offered the job 11 days after several other persons received their offers. The delay was due at least in part to the fact that the Department was investigating allegations that Fleming was a drug dealer. When the Department concluded its investigation and offered Fleming the job, he declined to accept it because, he claimed, his work on the police force would be forever compromised by the drug allegations.[8]

It is clear from the facts that Fleming has not suffered a cognizable injury. Under the due process clause of the fourteenth amendment, the government may not deprive a person of life, liberty or property without due process of law. Fleming was not, however, deprived of either a property or liberty interest that the Constitution protects. It is true that the right to "follow a chosen profession ... comes within the 'liberty' and 'property' concepts" of the due process clause. *Chalmers v. City of Los Angeles*, 762 F.2d 753, 757 (9th Cir.1985) (quoting *Greene v. McElroy*, 360 U.S. 474, 492, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959)). But Fleming was offered the job of police officer, and so was not deprived of the opportunity to pursue his chosen profession. At most he was the victim of a brief delay while a reviewing authority considered whether the offer should be made. Fleming cites no cases suggesting that one who is offered a job after a brief delay can successfully allege a denial of a due pro-

---

**8.** Fleming contends that nine months later, a ranking officer in the Department told him that he still thought that he was a drug dealer. He also alleges that his wife, the Director of Public Safety's niece, contacted the Director while the application was still pending, and that the Director told her that he could not hire Fleming because of rumors that he was a drug dealer.

cess interest, and we can think of no reason why we should reach such a conclusion under the facts of this case.

Fleming also appears to allege that the offer of a position with the Department of Public Safety was ineffective or illusory because the Director of Public Safety believed him to be a drug dealer. Yet Fleming offered no evidence at trial that suggests that the February 7, 1984, offer of employment was not bona fide. Absent such evidence, or some other persuasive explanation as to why the Director's conduct precluded him from accepting or performing the proffered position, Fleming has failed to establish even an arguable constitutional violation.

The only actual injury that Fleming may have sustained as a result of the Department's action is damage to his reputation. However, in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Supreme Court, in a case involving facts far more glaring than those involved here,[9] concluded that the interest in reputation is, without more, "neither 'liberty' nor 'property' guaranteed against state deprivation without due process of law." *Id.* at 713, 96 S.Ct. at 1166. Thus, Fleming has not suffered any constitutional violation in this regard either. His action for any damages to his reputation lies, if anywhere, in the tort of defamation, and not in section 1983.[10]

◼ Fleming's equal protection claim is similarly without merit. He contends that he was the only applicant of fourteen to be subjected to a Drug Enforcement Agency background check. Because this alleged harm does not involve a fundamental interest or a suspect or semi-suspect class, the rational basis standard of review is appropriate. *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 312–14, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (per curiam). While it may be true that Fleming was the only applicant to be subjected to a DEA check, there is no evidence in the record suggesting that there was any other applicant about whom the Department received reports of alleged drug activity. In light of the allegations against Fleming, it was not only rational but appropriate for the Department to investigate the allegations before offering to hire him.

For the foregoing reasons, we reverse the judgment of the district court, and remand with instructions to grant the Department's motion for judgment notwithstanding the verdict.

**REVERSED AND REMANDED**

---

9. In *Paul,* police chiefs had circulated to approximately 800 merchants in the Louisville, Kentucky metropolitan area a flyer listing the names and photographs of "active" shoplifters. Petitioner's name was included on the list.

10. Our cases suggest that in certain circumstances injury to reputation may implicate constitutional liberty interests. However, we have limited violations of liberty interests to those instances where an employee has been dismissed, and the reasons for dismissal have so stigmatized the person that his other employment opportunities have been jeopardized. *See, e.g., Clemente v. United States,* 766 F.2d 1358, 1365–66 (9th Cir.1985), *cert. denied,* 474 U.S. 1101, 106 S.Ct. 881, 88 L.Ed.2d 917 (1986); *Loehr v. Ventura County Community College Dist.,* 743 F.2d 1310, 1317 (9th Cir.1984); *Bollow v. Federal Reserve Bank,* 650 F.2d 1093, 1100–01 (9th Cir.1981), *cert. denied,* 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982). Because Fleming was not dismissed from employment and because he began employment at another Commonwealth agency shortly after he decided not to accept a position with the Department, Fleming cannot establish a violation of a liberty interest.